**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JOHN GYLLENHAMMER and**
**DENISE GYLLENHAMMER,**

         **Plaintiffs,**

**v.**              **3:15-cv-1143 (BKS/DEP)**

**THE AMERICAN NATIONAL RED CROSS,**

         **Defendant.**
_____

**Appearances:**

The Law Office of Alfred Paniccia, Jr.
Alfred Paniccia, Jr.
Centre Plaza
Suite 400
53 Chenango Street
Binghamton, NY 13901
For Plaintiffs

Webster Szanyi LLP
Michael P. McClaren
Jeremy A. Colby
424 Main Street
1400 Liberty Building
Buffalo, NY 14202
For Defendant

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.**    **INTRODUCTION**

   Plaintiffs John Gyllenhammer ("Plaintiff") and Denise Gyllenhammer bring this action

against Defendant The American National Red Cross for violations of N.Y. Labor Law §§

240(1), 241(6), and 200(1).[1] (Dkt. No. 2, pp. 3–8). The Complaint also contains negligence and loss of consortium claims. (*Id.*). These claims stem from injuries Plaintiff allegedly suffered while he was relocating a thermostat in Defendant's building on June 27, 2012. (*Id.*, ¶ 4). Presently before the Court are Defendant's motion for summary judgment (Dkt. No. 34); Plaintiffs' cross-motion for partial summary judgment on his Labor Law § 240(1) claim (Dkt. No. 37); and Defendant's motion to preclude Plaintiff's treating physician from offering expert testimony on causation. (Dkt. No. 35). For the reasons that follow, Defendant's motion for summary judgment is granted in part and denied in part, Plaintiffs' motion for summary judgment is denied, and Defendant's motion to preclude is granted.

## II.    BACKGROUND[2]

### A.    Facts

In or about May 2012, Christopher Holleran, vice president of Auchinachie Plumbing Ltd., inspected a building Defendant owned and occupied in Endicott, New York, and submitted a proposal to Defendant for "improvements to the [building's] heating and air conditioning systems." (Dkt. No. 37-7, ¶¶ 1–3; Dkt. No. 41-1, ¶¶ 1–3; Dkt. No. 37-2, pp. 372, 528–29). Defendant agreed to a number of "improvements," including, as relevant to this action, the cleaning of three boilers,[3] the "installation of four sensors and two thermostats for the air

---

[1]Defendant removed this action from New York State Supreme Court, County of Tioga. (Dkt. No. 1). This Court has original jurisdiction over actions involving the Red Cross. 36 U.S.C. § 300105.

[2]The facts stated herein are drawn from the parties' submissions, including the parties' statements of material facts and responses (Dkt. Nos. 34-4; 42-2; 37-7; 41-1) and the exhibits the parties have submitted, to the extent that they are admissible as evidence. Where facts stated in a party's statement of material facts are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court has found such facts to be true. *See* N.D.N.Y. L.R. 7.1(a)(3); Fed. R. Civ. P. 56(e).

[3]The proposal states, in relevant part:

> Problem #4: The primary heating system is a hot water heating system that contains three boilers and baseboard heaters. We noticed the second floor offices all have individual thermostats for individual controls. We also noticed that the boilers have an outdoor controller.

conditioning system" to improve the air conditioning system, which did not cool offices adequately, and the relocation of a heating thermostat, which was "behind a combination desk credenza in the executive director's office," and thus inaccessible.[4] (Dkt. No. 37-7, ¶ 6(i)–(iii); Dkt. No. 41-1, ¶ 6(i)–(iii)).

On June 27, 2012, the day of Plaintiff's injury, Auchinachie Plumbing sent Plaintiff and one other employee, Micah Champoux, to Defendant's building to perform maintenance work on the boilers, install sensors in four offices, and relocate a thermostat. (Dkt. No. 37-7, ¶¶ 8–9; Dkt. No. 41-1, ¶¶ 8–9; Dkt. No. 34-2, p. 37; Dkt. No. 37-2, pp. 206, 322). Plaintiff spent "between 20 minutes and an hour" completing the boiler maintenance work, which involved ensuring that the boilers' zone valves and pumps worked, before proceeding to the sensor installation. (Dkt. No. 34-2, pp. 41, 45).

Plaintiff and Champoux both worked on the sensor project. While Champoux installed control panels "in a . . . locked office in the hallway," Plaintiff ran "shielded wire"[5] from the control panels up to the drop ceiling and along hallway ceiling to the office receiving a sensor.

---

Solution: We feel that the boilers need to be service[d] and clean[ed]. All the thermostats and zone valves need to be tested for proper operations. The pumps and other controls on the system need to be inspected for proper operations. The thermostat for the heating in Shelley's office needs to be relocated so it is not behind the credenza.

(Dkt. No. 37-2, p. 528).

[4]The proposal states:

Problem #2: The AC units on the second floor are having trouble cooling the second floor.

Solution: After reviewing the location of the two thermostats for this floor I suggest replacing the two thermostats. The two thermostats that I suggest using now are different than the existing ones. The new thermostats will be installed in a locked room. Then we will install four sensors and connect them to the two thermostats in the locked room. These sensors will take an average temp for that zone thus allowing a more even temperature for the area you are trying to cool.

(*Id*. at p. 528).

[5]"[L]ow voltage wire." (Dkt. No. 37-2,  p. 383).

3

(Dkt. No. 37-2, p. 384; Dkt. No. 34-2, p. 49). Plaintiff cut a hole in the office wall for the sensor, inserted a fish stick[6] into the hole, drew the shielded wire down from the drop ceiling and through the hole, and attached the sensor to the shielded wire, completing the installation. (Dkt. No. 34-2, pp. 58, 75). In addition to the fish stick, Plaintiff used a six-foot A-frame ladder in the open position, a screwdriver, and "maybe some electrical wire snippers," to install the sensors. (*Id*. at pp. 49, 54). Plaintiff repeated the process for the first three offices. (*Id*. at p. 60).

The fall occurred in the fourth office. In addition to installing a sensor in that office, Plaintiff was tasked with "moving an existing wall-mounted thermostat to a different location in the same office." (Dkt. No. 37-3, ¶ 14; Dkt. No. 41-1, ¶ 14). "The existing thermostat was located on a wall behind a credenza, and the credenza was mounted to the top of a desk." (*Id*. at ¶ 15; Dkt. No. 41-1, ¶ 15). A photograph of the office where Plaintiff was working shows a u-shaped desk with a credenza mounted on one side of the desk and a separate rectangular cabinet

---

[6]"[F]ish sticks," are five to six feet-long "fiberglass poles," a "quarter-inch round," "with a loop on it" through which to "hook up wires" and push the wire into the drop ceiling. (Dkt. No. 34-2, p. 53).

(with a plant on top of it) next to another wall:



(Dkt. No. 37-2, p. 532).[7] Plaintiff testified that there was a second "cabinet – similar in size to

the cabinet depicted in the lower left corner of [the] photograph[] – located along the wall and

between th[at] cabinet . . . and the door." (Dkt. No. 37-7, ¶ 20). Defendant disputes that there was

a second cabinet and submits that "the only file cabinet situated along the wall of the office with

the window into the hallway was the file cabinet depicted in the" photograph. (Dkt. No. 41-1, ¶

20). "[T]he contents of the desk and credenza were not removed" before Plaintiff commenced

work. (Dkt. No. 37-7, ¶ 26; Dkt. No. 41-1, ¶ 26). The floor was carpeted. (Dkt. No. 34-2, p. 92).

---

[7]The photograph shows the thermostat in its relocated position and the newly installed sensor: the "thermostat is the round object on the wall, between the desk/credenza and the door, and the sensor is the white rectangular object above the thermostat." (Dkt. No. 37-7, ¶ 21).

According to Plaintiff, in order to access and remove the thermostat for relocation, "it was necessary . . . to reach behind the credenza." (Dkt. No. 37-7, ¶ 27). Plaintiff testified that when he and Champoux "first walked in[to]" the fourth office, he asked Champoux to help him move the desk, but that they were "unsuccessful." (Dkt. No. 34-2, pp. 51, 80). John Coniglio, Defendant's expert, opined that "it would have been possible for [Plaintiff] to move the desk if he had requested assistance from [Defendant's] employees." (Dkt. No. 41-1, ¶ 27). In any event, Plaintiff leaned a six-foot fiberglass A-Frame ladder, the only elevation device he had, (Dkt. No. 37-7, ¶¶ 11–13; Dkt. No. 41-1, ¶¶ 11–13), in "its 'closed' position," (Dkt. No. 34-4, ¶ 30; Dkt. No. 42-2, ¶ 30), "against a wall as close as he could get to the desk,[8] so he was able to reach the thermostat from above." (Dkt. No. 42-2, ¶ 30). Plaintiff testified that if he had opened the ladder, he would have been "too far away" to reach and remove the thermostat behind the credenza, (Dkt. No. 34-2, p. 194), and explained that in the closed position, "it was much easier to undo all the wires . . . to manipulate the screwdrivers." (*Id*. at p. 89). Plaintiff stood on the "[s]econd or third rung" of the ladder. (*Id*. at p. 93).

Sometime after Plaintiff ascended the ladder, Champoux entered the office. (Dkt. No. 34-2, p. 88). Plaintiff "turned at the waist to talk to him," while both feet remained on the rungs of the ladder. (*Id*. at pp. 94–95). Plaintiff had a screwdriver in his right hand. (*Id*. at p. 95). Champoux left the office. (Dkt. No. 34-4, ¶ 32; Dkt. No. 42-2, ¶ 32). Plaintiff "turned . . . to reach over the [credenza] and continue removing the thermostat . . . when the ladder shifted and [he] fell." (Dkt. No. 34-2, pp. 87–88). Plaintiff testified that he "fell off the ladder to [his] right, [he] hit the desk with [his] left knee, or shoulder; hit the floor with [his] knee and [his] head." (*Id*. at p. 91). The ladder "was still leaning against the wall" after the fall. (*Id*.). Plaintiff testified

---

[8] Plaintiff testified that the ladder was "within an inch" of the credenza. (Dkt. No. 34-2, p. 86).

that prior to his fall, he had never had any difficulties with the ladder, that it had never malfunctioned, and that it had never required repair. (Dkt. No. 34-4, ¶ 28; 42-2, ¶ 28).

Champoux, who had been standing outside the doorway when Plaintiff fell, (and who did not see the fall), went back into the office after hearing a noise, and found Plaintiff "face down" "on the ground next to the ladder." (Dkt. No. 37-2, pp. 223, 226; Dkt. No. 34-4, ¶ 34; Dkt. No. 42-2, ¶ 34). Champoux testified that he asked Plaintiff if "he was okay" and what had happened and that Plaintiff responded that he thought he was and that "he had come down off the ladder and his foot [or leg] got stuck and he fell." (Dkt. No. 37-2, pp. 226–27). Plaintiff claims that as a result of the fall, he injured his left knee and left shoulder.

After the fall, Plaintiff took a ten to fifteen minute break, and then "went back to removing the thermostat." (Dkt. No. 34-2, p. 103). Plaintiff stated that prior to the fall he had reached behind the credenza with his right arm and removed the cap of the thermostat, but he could not recall whether he had removed any of the "three screws" that held the thermostat "to the base."[9] (*Id*. at pp. 79, 90). To complete the relocation, Plaintiff removed all "three screws," cut or dislocated the thermostat wires, ran a new thermostat wire from the wall to the drop ceiling, cut a hole in the wall at the point of relocation, inserted the fish stick into the hole, drew the wire down to the hole, and connected the wire to the thermostat in its new location. (*Id*. at pp. 64–65).

Plaintiff went to a "Walk-In Clinic" later that afternoon complaining of left knee pain. (Dkt. No. 34-4, ¶¶ 81–82). On July 9, 2012, Plaintiff sought treatment from his family physician, and was referred to Dr. Thomas Van Gorder, an orthopedic surgeon. (*Id*. at ¶ 86). Dr. Van Gorder treated Plaintiff for knee pain, and eventually for shoulder pain. (*Id*. at ¶¶ 87–100). Dr.

---

[9]Plaintiff explained that there were "thermostat wires that are hooked up to that base" and that the base "is connected to a box inside the wall." (Dkt. No. 34-2, p. 79).

Van Gorder operated on Plaintiff's left knee in November 2012 and his left shoulder in April 2013. (Dkt. No. 34-2, pp. 288, 313–14).

### B.    Expert Evidence

#### 1.    Defendant's Expert – John Coniglio

Defendant contends that the A-frame ladder "in the proper opened and locked position would have been more than sufficient to support [Plaintiff's] weight and movements as he performed the task of relocating the thermostat." (Dkt. No. 34-5, ¶ 11). Defendant argues that therefore, if, as Plaintiff alleges, the ladder shifted, "this 'shift' was entirely due to [Plaintiff's] improper use thereof and his own failure to open the A-Frame ladder and lock the bracing." (*Id*.). Defendant has adduced evidence in support of this theory in the form of an expert report and declaration by John Coniglio, "a certified safety professional and a master trainer in construction safety." (*Id*. at ¶ 1).

Coniglio states that on September 19, 2016, he inspected Defendant's building as well as the office where Plaintiff fell. (Dkt. No. 34-5, pp. 1–2). Using a "six-foot A-Framed ladder identical to the one at issue," Coniglio formulated three scenarios that, in his opinion, would have allowed Plaintiff to access the "original location of the thermostat while using the ladder in the opened and locked position." (*Id*. at p. 4).

In the first scenario, Coniglio opines that Plaintiff could have placed the ladder "in an open position with the brackets locked," with the rungs and climbing steps parallel to the thermostat wall and "directly next to the desk and credenza." (Dkt. No. 34-5, p. 5). According to Coniglio, if Plaintiff had placed the ladder in this position, and with the climbing steps furthest from the wall, he would have had "easy access to the thermostat in order to remove the screws." (*Id*.). Coniglio provided a picture of a man demonstrating this scenario. (*Id*. at p. 39). The picture

shows a man standing on the third rung from the top of the ladder, facing the credenza, bent at the waist over the top of the ladder, leaning right, and with his right forearm on the top of the credenza. (*Id*. at p. 39).

In the second scenario, Coniglio opines that Plaintiff "could have placed an opened and locked A-Frame ladder parallel to the wall holding the thermostat with the feet of the ladder situated against the desk and credenza." (Dkt. No. 34-5, p. 4). The picture of this scenario shows the ladder turned so that the steps of the ladder are closest to the credenza. (*Id*. at p. 41). From there, Coniglio states, Plaintiff "could have stood on the second [step] . . . with his back to the ladder and had easy access to the thermostat." (*Id*. at p. 4). The picture shows a man standing on the fourth step from the top, with his back to the ladder, reaching behind the credenza with his left hand. (*Id*. at p. 41).

In the third scenario, Coniglio opined that Plaintiff could have opened the door to the adjacent office, secured the ladder, and placed it (with the rungs and steps parallel to the wall) in the threshold of the doorway against the inner edge of the door frame. (Dkt. No. 34-5, p. 4). This scenario, Coniglio stated, would place Plaintiff "only five and one half inches" from where he was "when [he] leaned the ladder against the wall," and would, in his opinion, give Plaintiff "easy access to the thermostat" behind the credenza. (*Id*. at pp. 4–5).

### 2.    Plaintiff's Expert – Ernest Gailor

Plaintiff offers expert opinion evidence from Ernest Gailor, a professional engineer and certified Occupational Safety and Health Administration instructor. (Dkt. No. 37-3). In Gailor's opinion, "on the day of his fall, [Plaintiff] did not have available to him any safety devices that would have allowed him to safely reach the thermostat behind the [credenza], and to safely

unfasten the thermostat from its mooring on the wall." (Dkt. No. 37-3, ¶ 8). In his declaration, Gailor addressed the first two scenarios proposed by Defendant's expert.

Gailor stated that, in his opinion, the first scenario (steps and rungs of ladder parallel to the thermostat wall) is not viable and would have been unsafe because Plaintiff "would have been too far from the thermostat to: a) reach the thermostat with two hands – one to operate a screwdriver to loosen the screws anchoring the thermostat to the electrical wiring and the second to hold the thermostat while the screws were loosened; and b) to see the thermostat as he was attempting to loosen the screws." (Dkt. No. 37-3, ¶ 11(i)). Additionally, Gailor posits that in this position, Plaintiff "would have had to extend the trunk of his body well beyond the ladder's front side rail nearest the desk" in order to reach the thermostat and would risk "overreaching" and tipping the ladder to the side. (*Id*. at ¶ 11(ii)).

Regarding the second scenario, (steps and rungs of ladder perpendicular to thermostat wall) Gailor noted that if, as Plaintiff had testified, there was cabinet on the "south wall of the office," there would not, in his opinion, be enough space to open the ladder. (Dkt. No. 37-3, ¶ 13). Gailor, however, opined that even if the ladder could have been opened so that the rungs were perpendicular to the wall and the front steps were closer to the desk, Plaintiff would have had to place "his back to the rails and . . . bend forward off the front of the ladder." (*Id*. at ¶ 14). In his declaration, Gailor opined that this scenario was untenable for several reasons: first, as Plaintiff's weight shifts away from the ladder, there is "a risk of ladder tip over towards the desk;" second, with Plaintiff's "back to the ladder, [he] has lost the ability to steady himself by holding onto the ladder with at least one hand;" and third, "[t]o compensate for both the shift in . . . weight from the ladder and the loss of use of his hands to steady himself," Plaintiff would

have to "lean on the [credenza]," which "is not a safety device intended to support workers at heights." (*Id*. at ¶ 14(i)–(iii)).[10]

With respect to the third scenario (the ladder positioned in the doorway threshold), Gailor testified that in his opinion, the distance between the ladder and the thermostat would have required Plaintiff to move his center of gravity off the ladder in order to reach the thermostat with both hands. (Dkt. No. 34-2, pp. 218–19). Gailor further testified that, in his experience, two hands are required to take apart a thermostat.[11] (*Id*. at p. 220).

### 3.    Rebuttal

Defendant also submitted a declaration by Coniglio rebutting Gailor's opinions. (Dkt. No. 41-2, pp. 1–6). In it, Conglio takes issue with, *inter alia*, Gailor's measurements, conclusions that Plaintiff would have had to lean over the ladder in any of the scenarios, and opinion that it would be unsafe to utilize the credenza for support in removing the thermostat. (*Id*.).

## III.    DISCUSSION

### A.    Standard of Review

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of

---

[10]Gailor opined that turning the ladder 180 degrees was not a viable alternative, either, because Plaintiff would have had to reach over the top of the ladder and "would have been too far from the thermostat to reach the thermostat with two hands to do the work." (Dkt. No. 37-3, ¶ 13). Gailor further opined that this scenario would place Plaintiff in danger of "tipping the ladder and collapsing the hutch." (*Id*.).

[11]There is no evidence that Plaintiff used both hands to remove the thermostat; he testified that he reached behind the credenza with his right arm. (Dkt. No. 34-2, p. 89).

the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 427 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim") (internal quotation marks omitted).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010)

(quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

### B.    Motion to Preclude the Nicosia Declaration

As an initial matter, in opposition to Plaintiffs' motion for partial summary judgment, Defendant submitted a declaration by Rebecca Nicosia, who is employed by Defendant and has worked in the building where Plaintiff's fall occurred "for the past thirteen . . . years." (Dkt. No. 41-3, ¶¶ 1–2). Nicosia states that she has been in the office where the fall occurred "on many occasions" during her employment and is "fully familiar with the layout of that office." (*Id*. at ¶ 5). She further states that "there has never been another file cabinet located closer to the door depicted at the top of the photograph" or "any piece of furniture in the office that would have prevented someone from opening the door." (*Id*. at ¶¶ 8–9). Plaintiffs move to preclude the declaration under Federal Rule of Civil Procedure 37(c)(1). (Dkt. No. 44-4, p. 3). The Court need not determine whether Defendant's allegedly untimely disclosure of Nicosia's declaration warrants preclusion, however, because Plaintiffs would not be entitled to summary judgment on their Labor Law § 240(1) claim, or any other claim, even if the Court precluded the declaration. Coniglio's first scenario regarding alternative placement of the ladder, if credited, would provide an adequate basis for a reasonable fact-finder to conclude that the ladder was an adequate safety device and that Plaintiff's misuse of it—in a closed position—was the sole proximate cause of his fall. Unlike scenarios two and three, the evidence in the record suggests that this scenario is viable regardless of the presence or absence of the second file cabinet. As Plaintiffs seek no form of relief other than preclusion of the declaration at the summary judgment stage, their motion is denied.

C.    **New York Labor Law § 240(1)**

"New York's 'scaffold law' imposes absolute liability upon landowners and general contractors." *Runner v. N.Y. Stock Exch., Inc.*, 568 F.3d 383, 386 (2d Cir. 2009) (citing *Rocovich v. Consol. Edison Co.*, 78 N.Y.2d 509, 513 (1991) ("[W]e have interpreted the section as imposing absolute liability for a breach which has proximately caused injury.")). It states, in relevant part:

> All contractors and owners and their agents . . . who contract for but do not direct or control the work, in the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed.

N.Y. Lab. Law § 240(1). "[T]he statute is meant to be liberally construed to accomplish its intended purpose." *O'Brien v. Port Auth. of N.Y. & New Jersey*, 29 N.Y.3d 27, 33 (2017) "The statute imposes upon owners, contractors and their agents a nondelegable duty that renders them liable regardless of whether they supervise or control the work." *Barreto v. Metro. Transp. Auth.*, 25 N.Y.3d 426, 433 (2015).

1.    **Covered Activity**

Defendant argues that Labor Law §§ 240(1) and 241(6)[12] are inapplicable because at the time of his fall Plaintiff was not engaged in a covered activity but performing routine

---

[12]Section 241(6) states:

> All contractors and owners and their agents, except owners of one and two-family dwellings who contract for but do not direct or control the work, when constructing or demolishing buildings or doing any excavating in connection therewith, shall comply with the following requirements:
>
> 6. All areas in which construction, excavation or demolition work is being performed shall be so constructed, shored, equipped, guarded, arranged, operated and conducted as to provide reasonable and adequate protection and safety to the persons employed therein or lawfully frequenting such places.  The commissioner may make rules to carry into effect the provisions of this subdivision, and the owners and contractors and their agents for such work  . . . shall comply therewith.

maintenance. To recover under either provision, "the plaintiff must have been engaged in a covered activity—'the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure' and must have suffered an injury as the direct consequence of a failure to provide adequate protection against a risk arising from a physically significant elevation differential." *Soto v. J. Crew Inc.*, 21 N.Y.3d 562, 566 (2013) (quoting Labor Law § 240(1), additional quotation marks omitted). "[T]he term 'altering' as used in section 240(1) 'requires making a significant physical change to the configuration or composition of the building or structure.'" *Sanatass v. Consol. Investing Co.*, 10 N.Y.3d 333, 337 (2008) (quoting *Joblon v. Solow*, 91 N.Y.2d 457, 465 (1998)). "Conversely, an alteration 'does not encompass simple, routine activities such as maintenance and decorative modifications.'" *Id.* (quoting *Panek v. County of Albany*, 99 N.Y.2d 452, 458 (2003)).

Defendant argues that the evidence shows that Plaintiff "was not required to make structural alterations or repairs and required only a screw driver to complete the task" he was performing at the time of the fall. (Dkt. No. 34-7, p. 3). In determining whether work is covered by § 240(1), the Court of Appeals of New York has rejected the contention that courts should "limit . . . analysis of plaintiff's activity to the moment of . . . injury," explaining that "'it is neither pragmatic nor consistent with the spirit of the statute to isolate the moment of injury and ignore the general context of the work.'" *Saint v. Syracuse Supply Co.*, 25 N.Y.3d 117, 124 (2015) (quoting *Prats v. Port Authority of N.Y. & N.J.*, 100 N.Y.2d 878, 882 (2003)). Courts must therefore consider "the totality of the plaintiff's actions" when determining whether the "plaintiff was engaged in work that constitutes an alteration within the meaning of the statute."

---

N.Y. Lab. Law § 241(6). The New York "Industrial Code (12 NYCRR 23-1.4[b][13] . . . define[s] what constitutes construction work within the meaning of the statute" and "includes 'work of the types performed in the construction, erection, *alteration*, repair, maintenance, painting or moving of buildings or other structures' in the definition of construction work." *Joblon v. Solow*, 91 N.Y.2d 457, 466 (1998). Thus, if Plaintiff's task meets the definition of alteration under Labor Law § 240, it will also meet the definition under § 241(6). *Id.*

*Id*. at 125. The Court of Appeals has defined the term "altering" as "'making a *significant physical change* to the configuration or composition of the building or structure.'" *Id*. (quoting *Joblon*, 91 N.Y.2d at 465). "Whether a physical change is significant depends on its effect on the physical structure." *Id*. In *Joblon*, the plaintiff was injured when he fell off a ladder while installing a wall clock. 91 N.Y.2d at 461–62. The Court of Appeals, while noting that "the question is close," found that:

> the work performed by Joblon was a significant physical change to the configuration or composition of the building. Joblon did more than the routine act of standing on a ladder to hang a clock on a wall. Bringing an electrical power supply capable of supporting the clock to the mail room, which required both extending the wiring within the utility room and chiseling a hole through a concrete wall so as to reach the mail room is more than a simple, routine activity and is significant enough to fall within the statute.

*Id*.

In this case, even setting aside the work Plaintiff performed to install the new sensors and only considering the totality of Plaintiff's actions with respect to relocating the thermostat, Plaintiff was making a significant physical change to Defendant's building. To relocate the thermostat, Plaintiff had to: remove the cap of thermostat and unscrew it from the office wall; detach the wires; thread the thermostat wires through the wall and up to the ceiling; cut a hole in the sheetrock at the point of relocation; pull the wire down from the ceiling and through the wall to the new location; re-wire the thermostat; and secure it to the wall. This is sufficient to show that Plaintiff's work activity constituted the "altering" of a building or structure within the meaning of Labor Law §§ 240(1) and 241(6). *See Joblon*, *supra*; *Roberts v. Globalfoundries, U.S., Inc.*, No. 1:13-CV-1169, 2015 WL 12942046, at *4[13] (N.D.N.Y. Sept. 14, 2015) (concluding that the plaintiff's work-related task of "pulling wire through a conduit at a junction box located on the sub-floor of a recessed area in the air chase room" constituted "'altering' of a

---

[13] LEXIS cite unavailable.

building or structure within the meaning of Labor Law § 240(1).”). Accordingly, the Court will

turn to the merits of Plaintiffs' Labor Law § 240(1) claim.

### 2.    Elements of a Labor Law § 240(1) Claim

To recover under Labor Law § 240(1), a plaintiff must show: (1) an “elevation-related

hazard to which the statute applies;” and (2) an injury proximately caused by the defendant’s

“failure to provide proper protection” for that hazard. *Wilinski v. 334 E. 92nd Hous. Dev. Fund

Corp.*, 18 N.Y.3d 1, 7 (2011). The parties appear to assume for purposes of the summary

judgment motion that Plaintiff’s activities involved an elevation-related risk; they dispute,

however, the issue of proximate cause.

Defendant argues that it is entitled to summary judgment because, as demonstrated by its

expert, the ladder provided proper protection and Plaintiff’s own negligence—his use of the

ladder in the closed position—was the sole proximate cause of his fall. (Dkt. No. 34-7, pp. 12–

13). Plaintiffs oppose Defendant’s motion and cross-move for summary judgment, arguing that it

is undisputed that Defendant’s failure to provide an adequate safety device that would have

prevented Plaintiff from falling proximately caused his injuries. (Dkt. No. 37-8, p. 7).

“To prevail on a Labor Law § 240(1) cause of action, a plaintiff must establish that the

statute was violated and that the violation was a proximate cause of his or her injuries.” *Allan v.

DHL Exp. (USA), Inc.*, 99 A.D.3d 828, 833 (2d Dep’t 2012) (citing *Berg v. Albany Ladder Co.*,

10 N.Y.3d 902, 904 (2008)). “[W]here an accident is caused by a violation of the statute, the

plaintiff’s own negligence does not furnish a defense; however, where a plaintiff’s own actions

are the sole proximate cause of the accident, there can be no liability.” *Barreto*, 25 N.Y.3d at 433

(internal quotation marks omitted); *Blake v. Neighborhood Hous. Servs. of N.Y. City, Inc.*, 1

N.Y.3d 280, 290 (2003) (“[T]here can be no liability under section 240(1) when there is no

violation and the worker's actions (here, his negligence) are the 'sole proximate cause' of the accident.").

It is undisputed that the Plaintiff was using the A-frame ladder in a closed position when he fell. "A worker's decision[, however,] to use an A–frame ladder in the closed position is not a per se reason to declare him the sole proximate cause of an accident." *Noor v. City of N.Y.*, 130 A.D.3d 536, 540 (1st Dep't 2015), *leave to appeal dismissed*, 27 N.Y.3d 975 (2016). Plaintiff testified that he would have been "too far away" to reach and remove the thermostat behind the credenza if he had used the ladder in an open position. (Dkt. No. 34-2, p. 194). Defendant argues that the opinion of its expert demonstrates that there were three different ways Plaintiff could have used the ladder in an open position to help him reach the thermostat behind the credenza, and that Plaintiff's misuse of the ladder (in the closed position) was therefore the sole proximate cause of his fall. Plaintiff's expert, however, opined that the first two scenarios would have placed Plaintiff at risk of "overreaching" and tipping the ladder. (Dkt. No. 37-3, ¶¶ 11(ii), 14(i)–(iii)). Additionally, Gailor noted that to the extent either of these scenarios required Plaintiff to lean on the credenza for support, the credenza "is not a safety device intended to support workers at heights." (*Id*. at ¶ 14(iii)). Indeed, furniture does not appear among the devices listed in Labor Law 240(1). *See* N.Y. Labor Law § 240(1) (identifying "scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, [and] ropes," as devices that may be suitable for work involving elevation-related risks). Plaintiff's expert does not appear to have directly addressed Defendant's expert's third scenario (placing the ladder in the open position inside the doorway threshold). Plaintiff argues that this was not, however, a viable scenario because there was a second filing cabinet in the office on the day of his injury and that the swing of the door

would have been obstructed by the cabinet.[14] (Dkt. No. 42-1, p. 14). Coniglio opined that even if there was a second cabinet, it "could be moved for clear access." (Dkt. No. 34-5, p. 41). There is, however, no evidence concerning the weight or mobility of the cabinet.

Given the parties' competing views of the evidence and the experts' difference of opinion concerning whether Plaintiff could utilize the ladder in an open position and safely access the thermostat behind the credenza for purposes of removal, the Court concludes that material issues of fact preclude summary judgment. Crediting Plaintiff's testimony and Gailor's opinion that Plaintiff could not safely reach and remove the thermostat with the ladder in an open position, a reasonable fact-finder could conclude that Defendant's failure to provide adequate elevation safety equipment proximately caused Plaintiff's fall. *See Saavedra v. 89 Park Ave. LLC*, 143 A.D.3d 615, 615 (1st Dep't 2016) (denying summary judgment on the plaintiff's Labor Law § 240(1) claim where there was evidence that the "[p]laintiff's use of a six-foot ladder that required him to stand on the top step did not make him the sole proximate cause of his accident where the eight-foot ladder could not be opened in the space due to the presence of construction debris."). Although Defendant argues that Plaintiff's admission that he did not attempt to complete the task with the ladder open undermines his claim that he could not use the ladder in an open position, (Dkt. No. 34-7, p. 15), evaluating the weight and credibility of Plaintiff's testimony is inappropriate at the summary judgment stage.

Plaintiffs argue that they are entitled to summary judgment with respect to Labor Law § 240(1) because "[u]nder no view of the evidence can it be determined that the lack or failure of safety devices was not at least a contributing factor in [his] fall." (Dkt. No. 37-8, p. 24). Here, however, Defendant has adduced evidence that Plaintiff received safety training through his employer with respect to the use of ladders, (Dkt. No. 34-2, p. 86), that there were "at least three

---

[14] As discussed, Defendant disputes the presence of a second filing cabinet.

scenarios where an opened and locked ladder would have allowed easy access to the thermostat,"[15] (Dkt. No. 34-7, p. 16), and that Plaintiff did not attempt to open the ladder. Crediting this evidence, a reasonable fact-finder could conclude that Plaintiff's own misuse[16] of the ladder was the sole proximate cause of his fall. *Cahill v. Triborough Bridge & Tunnel Auth.*, 4 N.Y.3d 35, 40 (2004) (concluding that the plaintiff was not entitled to summary judgment on his Labor Law § 240(1) claim where "a jury could have found that plaintiff had adequate safety devices available; that he knew both that they were available and that he was expected to use them; that he chose for no good reason not to do so; and that had he not made that choice he would not have been injured"). Thus, Plaintiff's motion for summary judgment is denied.

### D.    Labor Law § 241(6)

Defendant seeks summary judgment dismissing Plaintiffs' Labor Law § 241(6) claim on the ground that they have failed to demonstrate that Defendant violated the New York Industrial Code. (Dkt. No. 34-7, p. 23). Section 241(6) of the New York Labor Law is applicable to "[a]ll contractors and owners and their agents" and states: "All areas in which construction, excavation or demolition work is being performed shall be so constructed, shored, equipped, guarded, arranged, operated and conducted as to provide reasonable and adequate protection and safety to the persons employed therein or lawfully frequenting such places." N.Y. Labor Law § 241(6). It

---

[15]Defendant argues that Plaintiffs should be precluded from offering a rebuttal opinion by Gailor in response to Mr. Coniglio's opinion that "the ladder could have been used in the opened and locked position," because they failed to provide any rebuttal in their expert disclosures. (Dkt. No. 34-7, p. 22–23). As Plaintiffs have not offered a rebuttal by Gailor, this does not appear to be an issue.

[16]Defendant notes that Champoux testified that immediately after the fall, Plaintiff told him that his foot or leg got "stuck" in the ladder and made no mention of the ladder "shifting." Citing *Stark v. Eastman Kodak Co.*, 256 A.D.2d 1134 (4th Dep't 1998), Defendant argues that "[t]his evidence undeniably demonstrates that Plaintiff's fall resulted solely from Plaintiff's own misstep, and not any defect or shift in the ladder." (Dkt. No. 34-7, p. 21). In *Stark*, the Appellate Division found that the defendant was entitled to summary judgment on the ground that the plaintiff's actions "were the sole proximate cause of his injuries" where the undisputed evidence showed that the plaintiff did not fall from the ladder but believing "that he was on the bottom rung of the ladder[,] was injured when he stepped from the second rung of the ladder to the roof, contacting the roof with greater force than he expected." *Id*. In this case, however, there are material issues of fact as to whether the ladder provided proper protection, Plaintiff's leg or foot caught in the ladder, or the ladder shifted.

further states that: "The commissioner may make rules to carry into effect the provisions of this subdivision, and the owners and contractors and their agents for such work . . . shall comply therewith." *Id*. "As is the duty imposed by Labor Law § 240(1), the Labor Law § 241(6) duty to comply with the Commissioner's regulations is nondelegable." *Ross v. Curtis-Palmer Hydro-Elec. Co.*, 81 N.Y.2d 494, 502 (1993). "Thus, to the extent that the plaintiff has asserted a viable claim under Labor Law § 241(6), he need not show that defendants exercised supervision or control over his worksite in order to establish his right of recovery." *Id*.

"As [Labor Law § 241(6)] is not self-executing, a plaintiff must set forth a violation of a specific rule or regulation promulgated pursuant to it." *Wilinski v. 334 E. 92nd Hous. Dev. Fund Corp.*, 18 N.Y.3d 1, 11–12 (2011). "Those rules and regulations are embodied in New York's Industrial Code, 12 N.Y. Comp. Codes R. & Regs. ch. I, subch. A, which is promulgated by the Commissioner of the Department of Labor." *Pina v. Dora Homes, Inc.*, No. 09-CV-1626 FB JMA, 2013 WL 359386, at *4, 2013 U.S. Dist. LEXIS 11763, at *10 (E.D.N.Y. Jan. 29, 2013).

Defendant argues that it is entitled to dismissal of the Labor Law § 241(6) claim because Plaintiffs did not identify which provision of the Industrial Code Defendant allegedly violated in the Complaint. Indeed, Plaintiffs' first reference to the Industrial Code (12 N.Y.C.R.R. § 23-1.21) was in the Civil Case Management Plan. (Dkt. No. 10, p. 3). Moreover, Plaintiffs did not identify the specific subdivisions on which they rely—(b)(1), (b)(4)(v), (b)(9), and (e)(2)—until they filed their response to Defendant's motion for summary judgment. (Dkt. No. 42-1, p. 20).

"Although a plaintiff asserting a Labor Law § 241(6) cause of action must allege a violation of a specific provision of the Industrial Code, a failure to identify the Code provision in the complaint or bill of particulars is not fatal to such a claim," and a "plaintiff's belated assertion of a violation of [a specific provision of the Industrial Code] is properly considered" if

"it involve[s] no new factual allegations, raise[s] no new theories of liability, and cause[s] no prejudice." *Sheng Hai Tong v. K & K 7619, Inc.*, 144 A.D.3d 887, 889 (2d Dep't 2016) (internal citations omitted) (citing *Ross*, 81 N.Y.2d at 503). Below, the Court considers the subdivisions at issue.

### 1.    Section 23-1.21(b)(1)

Section 23-1.21(b)(1) sets forth "[g]eneral requirements for ladders" and provides: "Strength. Every ladder shall be capable of sustaining without breakage, dislodgment or loosening of any component at least four times the maximum load intended to be placed thereon." 12 N.Y.C.R.R. § 23-1.21(b)(1). There is no allegation in this action that the ladder broke or that there was a "dislodgment or loosening of any component," and therefore, Defendant is entitled to summary judgment as to § 23-1.21(b)(1).

### 2.    Section 23-1.21(b)(4)(v)

Section 23-1.21(b)(4)(v) states: "The upper end of any ladder which is leaning against a slippery surface shall be mechanically secured against side slip while work is being performed from such ladder." 12 N.Y.C.R.R. § 23-1.21(b)(4)(v). There is no allegation in this action that the wall against which Plaintiff leaned the ladder was slippery, and accordingly Defendant is entitled to summary judgment as to § 23-1.21(b)(4)(v).

### 3.    Section 23-1.21(b)(9)

Section 23-1.21(b)(9) states: "Placement of ladders in door openings. Ladders shall not be placed in door openings unless the doors are securely fastened open, closed and locked or otherwise effectively guarded against swinging." 12 N.Y.C.R.R. § 23-1.21(b)(9). There is no allegation that the ladder was placed in a door opening, and accordingly, Defendant is entitled to summary judgment as to § 23-1.21(b)(9).

### 4.     Section 23-1.21(e)(2)

Section 23-1.21(e)(2), which addresses stepladders,[17] states: "Bracing. Such bracing as may be necessary for rigidity shall be provided for every stepladder. *When in use every stepladder shall be opened to its full position and the spreader shall be locked*." 12 N.Y.C.R.R. § 23-1.21(e)(2) (emphasis added). Plaintiffs solely rely on the second sentence, italicized above, in support of their Labor Law § 241(6) claim. Plaintiffs' reliance on this section does not involve new factual allegations or raise a new theory of liability; it stems from their allegation that because Defendant failed to provide adequate safety equipment, Plaintiff's only option was to use the ladder in the closed position, in violation of § 23-1.21(e)(2). *See Sheng Hai Tong*, *supra*. Thus, Plaintiffs' identification of this section, while belated, is not prejudicial to Defendant or fatal to their § 241(6) cause of action. Accordingly, the Court must consider whether § 23-1.21(e)(2) provides a basis for liability in this case.

Here, Defendant's argument is not that § 23-1.21(e)(2) is inapplicable to the facts of this case. Rather, it is that § 23-1.21(e)(2) is *too general* to support a § 241(6) claim. (Dkt. No. 34-7, p 25). In response, Plaintiffs acknowledge that the first sentence of (e)(2) appears to contain a "general requirement" that is not actionable under Labor Law 241(6), (Dkt. No. 42-1, p. 21), but argue that the second sentence, on which they rely, "sets forth a specific safety guideline." (*Id*.).

"The New York Court of Appeals has drawn a distinction 'between provisions of the Industrial Code mandating compliance with concrete specifications and those that establish general safety standards': 'The former give rise to a nondelegable duty, while the latter do not.'" *Pina*, 2013 WL 359386, at *4, 2013 U.S. Dist. LEXIS 11763, at *10–11 (quoting *Ross*, 81 N.Y.2d at 505). It has not, however, addressed § 23-1.21(e)(2) and the New York Appellate

---

[17]The Industrial Code defines a stepladder as "[a] self-supporting portable ladder, nonadjustable in length, having flat steps or heavy duty rungs and a hinged backs." 12 N.Y.C.R.R. § 23-1.4(B)(53).

Divisions that have considered it appear to differ. *Compare Przyborowski v. A & M Cook, LLC*,
120 A.D.3d 651, 654 (2d Dep't 2014) (finding that § 23-1.21(e)(2) "set[s] forth specific, rather
than general, safety standards, and [is] sufficient to support a Labor Law § 241(6) cause of
action"); *with Spenard v. Gregware Gen. Contracting*, 248 A.D.2d 868, 871, (3d Dep't 1998)
("[W]e are of the view that 12 NYCRR 23–1.21(e)(2) merely recites a general safety standard
regarding the bracing of ladders and, therefore, is insufficient to sustain a cause of action under
Labor Law § 241(6)."); *Lopez v La Fonda Boricua, Inc.*, 136 A.D.3d 588, 589 (1st Dep't Feb.
25, 2016) (same). Additionally, the Appellate Divisions have not addressed whether, as Plaintiffs
contend, even assuming the first sentence is not specific enough to permit recovery, the second
sentence "sets forth a specific requirement or standard of conduct." *Ross*, 81 N.Y.2d at 503.

The Second Circuit has instructed that "in the absence of authoritative law from the
state's highest court," the court "must either (1) predict how the New York Court of Appeals
would resolve the state law question, or, if state law is so uncertain that" the court cannot make a
"reasonable prediction, (2) certify the question to the New York Court of Appeals for a definitive
resolution." *DiBella v. Hopkins*, 403 F.3d 102, 111 (2d Cir. 2005). The parties do not argue that
certification is warranted in this case, nor does this case appear to present circumstances "that
would justify using the certification procedure." *Id*. Thus, the Court must predict how the New
York Court of Appeals would rule if presented with this issue.

The Industrial Code provision on which a Labor Law § 241(6) claim is premised must
contain a "'specific, positive command,' rather than a 'reiteration of common-law standards'
which would merely incorporate into the State Industrial Code a general duty of care." *Rizzuto v.
L.A. Wenger Contracting Co.*, 91 N.Y.2d 343, 349 (1998) (quoting *Ross*, 81 N.Y.2d at 504). In
*Ross*, the Court of Appeals held that:

> for purposes of the nondelegable duty imposed by Labor Law § 241(6) and the regulations promulgated thereunder, a distinction must be drawn between provisions of the Industrial Code mandating compliance with concrete specifications and those that establish general safety standards by invoking the "[g]eneral descriptive terms" set forth and defined in 12 NYCRR 23-1.4 (a). The former give rise to a nondelegable duty, while the latter do not.

81 N.Y.2d at 505. Section 23-1.4(a) explains "[g]eneral descriptive terms" as follows:

> As used in this Part (rule), such general terms as *adequate, effective, equal, equivalent, firm, necessary, proper, safe, secure, substantial, sufficient, suitable and other similar terms* when used to describe materials, devices, structures, methods and procedures required by this Part (rule) shall mean that such materials, devices, structures, methods and procedures shall be of such kind and quality as a reasonable and prudent man experienced in construction, demolition and excavation operations would require in order to provide safe working conditions for himself in the performance of such work.

12 N.Y.C.R.R. § 23-1.4(a) (emphasis added).

As an initial matter, the Court notes that there is precedent for considering the sentences of a single provision separately. In *Misicki v. Caradonna*, 12 N.Y.3d 511 (2009), for example, the New York Court of Appeals found that the first two sentences of 12 NYCRR 23-9.2(a),[18] a regulation regarding power-operated equipment, were "not specific enough to permit recovery under section 241(6)" but "reach[ed] the opposite conclusion about the third sentence" and found that it imposed an affirmative duty on employers and mandated a "distinct standard of conduct, rather than a general reiteration of common-law principles." *Id.* at 520–21. The court therefore concluded that the third sentence was "precisely the type of 'concrete specification' that *Ross* requires" and could support a § 241(6) claim. *Id.* In its explanation, the court highlighted the difference between the general terms used in the sentences it found to recite general common law

---

[18]Section 23-9.2(a) provides, in relevant part:

> All power-operated equipment shall be maintained in good repair and in proper operating condition at all times. Sufficient inspections of adequate frequency shall be made of such equipment to insure such maintenance. Upon discovery, any structural defect or unsafe condition in such equipment shall be corrected by necessary repairs or replacement.

12 N.Y.C.R.R. § 23-9.2(a).

standards of care and the specific terms contained in the sentence it found to impose an

"affirmative duty" to act on an employer or owner:

> In our view, the first two sentences of section 23-9.2 (a)—which employ only
> such general phrases as "good repair," "proper operating condition," "[s]ufficient
> inspections," and "adequate frequency"—are not specific enough to permit
> recovery under section 241 (6) against a nonsupervising owner or general
> contractor. We reach the opposite conclusion about the third sentence, however.
> This portion of the regulation imposes an affirmative duty on employers to
> "correct[ ] by necessary repairs or replacement" "any structural defect or unsafe
> condition" in equipment or machinery "[u]pon discovery" or actual notice of the
> structural defect or unsafe condition. As a result, the third sentence of section 23-
> 9.2 (a) "mandates a distinct standard of conduct, rather than a general reiteration
> of common-law principles, and is precisely the type of 'concrete specification'
> that *Ross* requires"

*Id*. at 520–21 (quoting *Rizzuto*, 91 N.Y.2d at 351).

The analysis the court employed in *Minsicki* is useful in this case. The first sentence of

the stepladder provision at issue states: "Such bracing as may be necessary for rigidity shall be

provided for every stepladder." 12 N.Y.C.R.R. § 23-1.21(e)(2). As Plaintiff's theory of liability

does not stem from this sentence but from Defendant's alleged violation of the second sentence,

the Court makes no determination as to its generality or specificity. The second sentence of § 23-

1.21(e)(2) states: "[w]hen in use every stepladder shall be opened to its full position and the

spreader shall be locked." The Court notes this sentence contains none of the "general phrases"

enumerated in 12 N.Y.C.R.R. § 23-1.4(a), but sets forth two "specific, positive command[s]"

about the manner in which a stepladder is to be configured when in use, *Ross*, 81 N.Y.2d at 504;

it requires employers or owners to ensure that "every stepladder" is "opened to its full position"

and its "spreader locked" whenever a stepladder is "in use." 12 N.Y.C.R.R § 23-1.21(e)(2). The

Court therefore concludes that the second sentence of § 23-1.21(e)(2) is sufficiently specific to

permit recovery under Labor Law § 241(6). *See Morris v. Pavarini Constr.*, 9 N.Y.3d 47, 50

(2007) (examining 12 N.Y.C.R.R. § 23-2.2(a), "which says in relevant part: 'Forms . . . shall be

structurally safe and shall be properly braced or tied together so as to maintain position and shape,'" and concluding that although "[t]he words 'structurally safe' and the adverb 'properly' are not specific enough to be a basis for Labor Law § 241(6) liability, but the words 'braced or tied together so as to maintain position and shape' impose more specific requirements.").

Plaintiff has adduced evidence that he was injured when he fell from a closed A-frame ladder, thus implicating 12 N.Y.C.R.R. § 23-1.21(e)(2), which requires a stepladder to be open to "its full position" and its "spreader locked" when "in use." Additionally, as discussed, there are material issues of fact as whether Defendant's alleged violation of this provision proximately caused Plaintiff's injuries.[19] *See* Sec. III.C.2, *supra*; *see also Przyborowski*, 120 A.D.3d at 652 (denying motion for summary judgment with respect to Labor Law § 241(6) claim where the "plaintiff allegedly sustained injuries when he fell while descending an unsecured A-frame ladder at his work site" explaining that the defendants failed to show that the "Industrial Code provisions," the plaintiff relied on, including § 23-1.21(e)(2), "were inapplicable to the facts of this case, or that the alleged violation of those provisions was not a proximate cause of the plaintiff's injuries."); *see also Misicki*, 12 N.Y.3d at 521 ("If [the employer's] negligence is established, [the owner] would be vicariously liable for plaintiff's injuries without regard to fault."). Accordingly, Defendant's motion for summary judgment dismissing Plaintiffs' Labor Law § 241(6) claim is denied.

### E.    Labor Law § 200(1) & Negligence

Defendant seeks summary judgment dismissing Plaintiffs' Labor Law § 200(1) and negligence claims on the grounds that there is no evidence that it exercised supervisory control or "created a dangerous condition that caused or contributed" to Plaintiff's injuries. (Dkt. No. 34-

---

[19]As a further matter, contributory negligence and comparative negligence are defenses to claims under Labor Law § 241(6)). *Long v. Forest-Fehlhaber*, 55 N.Y.2d 154, 161 (1982).

7, p. 25; Dkt. No. 43, p. 6). Plaintiffs argue that the desk and credenza situated in front of the

thermostat constituted a dangerous condition and should have been moved prior to the work.

(Dkt. No. 42-1, p. 22). Plaintiffs cite no legal authority in support of this argument.

> New York Labor Law § 200 provides, in pertinent part:

> All places to which this chapter applies shall be so constructed, equipped,
> arranged, operated and conducted as to provide reasonable and adequate
> protection to the lives, health and safety of all persons employed therein or
> lawfully frequenting such places.  All machinery, equipment, and devices in such
> places shall be so placed, operated, guarded, and lighted as to provide reasonable
> and adequate protection to all such persons.

N.Y. Labor Law § 200(1). Labor Law § 200(1) codifies "the common law duty imposed upon an

owner or general contractor to provide construction workers with a safe place to work." *Baklous*

*v. Amtrak*, 933 F. Supp. 2d 444, 454 (E.D.N.Y. 2013) (citing *Lamela v. City of New York*, 560 F.

Supp. 2d 214, 221 (E.D.N.Y. 2008)). Thus, "New York courts analyze common law claims

alleging an unsafe workplace under the same framework as [Labor Law § 200] claims." *Wallace*

*v. Natl. R.R. Passenger Corp.*, 5 F. Supp. 3d 452, 466 (S.D.N.Y. 2014); *see Wojcik v. 42nd Street*

*Dev. Project, Inc.*, 386 F. Supp. 2d 442, 456 (S.D.N.Y. 2005). Work performed using a ladder

generally falls within the protection afforded by Labor Law § 200. *Moran v. Manos*, 04 Civ.

6896, 2009 WL 1059637, at *5, 2009 U.S. Dist. LEXIS 61598, at *15 (S.D.N.Y. Apr. 15, 2009)

(citing *Higgins v. 1790 Broadway Assocs.*, 261 A.D.2d 223, 224 (1st Dep't 1999)).

> Cases involving Labor Law § 200(1) fall into two categories—"those where workers are

injured as a result of dangerous or defective *premises* conditions at a work site, and those

involving the *manner* in which the work is performed." *Zapata v. Riverside Study Ctr., Inc.*, 10

Civ. 6283, 2012 WL 1744792, at *10, 2012 U.S. Dist. LEXIS 69246, at *27 (S.D.N.Y. May 16,

2012) (emphasis added). Whether a case is classified in the "premises" category or the "manner"

category "depends generally on the party who provided the structure or equipment giving rise to

the accident." *Id.*, 2012 WL 1744792, at *10, 2012 U.S. Dist. LEXIS 69246, at *27; *see Ortega v. Puccia*, 57 A.D.3d 54, 62 (2d Dep't 2008).

In "manner" cases—where the alleged defect or dangerous condition arises from the contractor's methods— "recovery against the owner or general contractor cannot be had under [Labor Law] § 200(1) unless it is shown that the party to be charged had the authority to supervise or control the performance of the work." *Zapata*, 2012 WL 1744792, at *10, 2012 U.S. Dist. LEXIS 69246, at *27 (citing *Ortega*, 57 A.D.3d at 61)). An owner has "the authority to supervise or control the work for purposes of Labor Law § 200 when that [owner] bears the responsibility for the manner in which the work is performed." *Pilato v. 866 U.N. Plaza Assoc., LLC*, 77 A.D.3d 644, 646 (2d Dep't 2010); *see Davis v Cumberland Farms, Inc.*, 1:10-CV-480, 2013 WL 375477, at *4, 2013 U.S. Dist. LEXIS 12132, at *13 (N.D.N.Y. Jan. 29, 2013) ("[g]eneral supervisory authority for the purpose of overseeing the progress of the work and inspecting the work product is insufficient to impose liability").

On the other hand, in "premises" cases, a property owner may be liable—even if the owner exercises no supervisory control over the operation—if "(1) [the owner] created the dangerous condition causing the injury or (2) failed to remedy a dangerous or defective condition of which [the owner] had actual or constructive notice." *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 57 F. Supp. 3d 328, 341 (S.D.N.Y. 2014). Indeed, "[w]here a premises condition is at issue, property owners may be held liable for a violation of Labor Law § 200 if the owner either created the dangerous condition that caused the accident or had actual or constructive notice of the dangerous condition that caused the accident." *Ortega*, 57 A.D.3d at 61 (citations omitted). Where, as here, a plaintiff's "claim is based upon premises liability, the landowner's duty is to provide the worker with a safe place to work." *Schindler v. Ahearn*, 69

29

A.D.3d 837, 838 (2d Dep't 2010) (citing *Gasper v. Ford Motor Co.*, 13 N.Y.2d 104, 110 (1963)). The owner, however, "need not guard against hazards inherent in the worker's work, hazards caused by the condition the worker is engaged to repair, or hazards which are readily observed by someone of the worker's age, intelligence, and experience." *Id.* (citing *Gasper*, 13 N.Y.2d at 110).

In this case, the obstruction the desk and credenza posed to accessing the thermostat was the precise problem that Plaintiff was engaged to repair. Moreover, it is undisputed that Plaintiff was aware of both the desk and credenza and their placement in proximity to the thermostat. *Rosenblatt v. Wagman*, 56 A.D.3d 1103, 1105 (3d Dep't 2008) (finding that the defendants could not be held liable in negligence or under Labor Law § 200 where the evidence showed that the plaintiff was aware that "that the railing upon which he rested the ladder was wobbly and that the ladder did not have rubber feet, which would help prevent slipping"). Accordingly, Defendant is entitled to summary judgment dismissing Plaintiffs' Labor Law § 200 and negligence claims.

### F.    Attorneys' Fees

As part of its motion for summary judgment, Defendant requests, under 28 U.S.C. § 1927, an award of the "attorneys' fees [and costs it] incurred in defending against Plaintiffs' Labor Law §§ 241(6), 200(1) and common law negligence claims." (Dkt. No. 34-7, pp. 26–27). Section 1927 provides: "Any attorney or other person . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. The Second Circuit has instructed that sanctions under § 1927 "may be imposed . . . only when there is a finding of conduct constituting or akin to bad faith" explaining that "an award . . . is proper when the attorney's actions are so completely without merit as to require the

conclusion that they must have been undertaken for some improper purpose such as delay." *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d at 115 (internal quotation marks omitted). The Court has concluded that Plaintiffs have adduced evidence creating a material issue of fact with respect to their Labor Law § 241(6) claim, and although Defendant is entitled to summary judgment dismissing Plaintiffs' Labor Law § 200 and negligence claims, those claims were not "so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose." *Id*. Accordingly, Defendant's request for an award of attorneys' fees and costs is denied.

### G.    Motion to Preclude Expert Testimony from Treating Physician

Defendant moves to preclude the testimony of Dr. Thomas Van Gorder, an orthopedic surgeon and Plaintiff's treating physician, on the issue of whether Plaintiff's alleged knee and shoulder injuries conditions are causally related to his fall from the ladder. (Dkt. No. 36). Although Plaintiffs oppose Defendant's motion, there is nothing in the record indicating that Plaintiffs have identified Dr. Van Gorder as a witness they intend to use to present expert testimony at trial or provided a summary of the opinions to which Dr. Van Gorder is expected to testify.[20] In his deposition, however, Dr. Van Gorder, testified that in his opinion: (1) the "trauma" of the June 27, 2012 fall caused injury to Plaintiff's left knee (Dkt. No. 34-2, p. 294); and (2) the labral tear in Plaintiff's left shoulder was caused by a "traumatic injury" (Dkt. No. 34-2, p. 313). Thus, it is these opinions that the Court considers.

---

[20]Since treating physicians generally are not "retained or specially employed to provide expert testimony," the Federal Rules of Civil Procedure do not require them to provide a written report. Fed. R. Civ. P. 26(a)(2)(B), (C); *see also id*. advisory committee's note to 2010 amendment (citing physicians as an example of "[a] witness who is not required to provide a report under Rule 26(a)(2)(B)."). In the event, however, that a party intends a treating physician to "testify as a fact witness and also provide expert testimony under [Fed. R. Evid.] 702, 703, or 705," *id*., the party must provide a disclosure stating: "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C)(i)–(ii).

Dr. Van Gorder began treating Plaintiff on July 10, 2012. (Dkt. No. 34-3, p. 57). According to Dr. Van Gorder's notes, at that appointment, Plaintiff recounted the circumstances of his June 27, 2012 fall and complained of left knee pain. (*Id*.). Following physical therapy and an MRI, which showed "a medial meniscal tear," and in view of Plaintiff's continued difficulty with his knee, Dr. Van Gorder recommended "operative arthroscopy." (Dkt. No. 34-3, p. 61). On November 2, 2012, Dr. Van Gorder performed arthroscopic surgery. (Dkt. No. 34-2, p. 288). Based on the surgery, Dr. Van Gorder diagnosed chondromalacia of the patellar status post-contusion and synovitis, which he explained were, respectively, arthritis under the kneecap and the "wearing away of some of the articular cartilage under the kneecap" and inflammation. (Dkt. No. 34-2, pp. 291–92). Dr. Van Gorder stated that the damage to Plaintiff's knee could be caused by either acute injury or overuse. (Dkt. No. 34-2, p. 294). Dr. Van Gorder opined during his deposition that the articular cartilage in Plaintiff's left knee "had been banged up from the trauma," but acknowledged that there was nothing he "could physically see" during the surgery that led him to this conclusion, and that he based it on the "history he took" from Plaintiff. (Dkt. No. 34-2, p. 294).

On September 27, 2012, three months after his fall, Plaintiff first reported to Dr. Van Gorder[21] that he had hit his left shoulder "against the ground when he fell" and complained of shoulder pain. (Dkt. No. 34-3, p. 61). There is evidence in the record that this was not the first time Plaintiff suffered left shoulder pain—Plaintiff sought medical care for left shoulder pain in in June 2006 following an incident involving "the fall of a washer and refrigerator," (*id*. at p. 16), and Plaintiff indicated during his deposition that he dislocated his left shoulder when he was fifteen (Dkt. No. 34-4, ¶ 103). Nothing in the record before the Court suggests that Dr. Van

---

[21]On July 9, 2012, Plaintiff reported to his family physician that he hit his knee, head, and shoulder during the fall. (Dkt. No. 34-2, p. 47).

Gorder was aware of June 2006 incident; Plaintiff, however, told Dr. Van Gorder that he had previously dislocated his right[22] shoulder. (*Id*. at ¶ 102). Dr. Van Gorder ordered an MRI, which revealed an anterior labral tear, and on April 26, 2013, operated on Plaintiff's shoulder, during which he found, in addition to the labral tear, a "condral lesion consistent with arthritis." (Dkt. No. 34-3, p. 64; Dkt. No. 34-2, pp. 313–14). Dr. Van Gorder testified that he concluded that Plaintiff had suffered a "traumatic injury" to his shoulder, but offered no opinion as to when Plaintiff might have suffered such an injury. (Dkt. No. 34-2, p. 313).

        To the extent Dr. Van Gorder has relevant information as a fact witness regarding his examination and treatment of Plaintiff, such as his observations of Plaintiff's condition, tests he ran, and surgeries he performed on Plaintiff, his testimony is admissible. *See*, *e.g.*, *United States v. Cuti*, 720 F.3d 453, 457 (2d Cir. 2013). Where, however, Dr. Van Gorder's testimony is based on scientific, technical or specialized knowledge, such as a medical diagnosis[23] or an opinion on causation, it is not admissible lay opinion testimony. *See Cuti*, 720 F.3d at 459 ("The Advisory Committee's Note on Rule 701 instructs that 'a witness' testimony must be scrutinized under the rules regulating expert opinion to the extent that the witness is providing testimony based on scientific, technical, or other specialized knowledge within the scope of Rule 702." (quoting Fed. R. Evid. 701 advisory committee's note, 2000 amend.)); *see also* Fed. R. Evid. 701(c); Advisory Committee's Note to 2000 Amendments (explaining "that the distinction between lay and expert witness testimony is that lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by

---

[22]Plaintiff testified at his deposition that he recalled dislocating his shoulder in a motorcycle accident. (Dkt. No. 34-2, pp. 14–15). Although the questioning attorney referred to the left shoulder, (*id*. at p. 13), Plaintiff did not specify which shoulder.

[23]The parties have not addressed the admissibility of Dr. Van Gorder's opinions regarding diagnosis. The Court therefore makes no determination as to their admissibility.

specialists in the field'") (quoting *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992)). Thus, Dr.

Van Gorder may not provide opinions regarding causation unless he qualifies to provide such

opinions under Federal Rule of Evidence 702 and his testimony meets the reliability standards

set forth in Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597

(1993). *See Pierce v. City of New York*, 16 Civ. 5703, 2017 WL 2623857, at *2, 2017 U.S. Dist.

LEXIS 93087, at *5 (E.D.N.Y. June 16, 2017) (explaining that the plaintiff's treating physicians

could not testify as to general causation because "plaintiff has suffered several significant

injuries unrelated to the events of September 1, 2014, and only an expert, employing analysis

that would pass muster under *Daubert*, for example a differential diagnosis, would be qualified

to offer an opinion as to causation and distinguish between the effects of those unrelated injuries

versus the effects of the September 1, 2014 incident") (internal quotation marks omitted); *N.K.*

*by Bruestle-Kumra v. Abbott Labs.*, No. 14-CV-4875, 2017 WL 2241507, at *8, 2017 U.S. Dist.

LEXIS 77461, at *23–24 (E.D.N.Y. May 22, 2017) ("'[W]hen a treating physician seeks to

render an opinion on causation, that opinion is subject to the same standards of scientific

reliability that govern the expert opinions of physicians hired solely for the purposes of

litigation.'") (quoting *Davids v. Novartis Pharm. Corp.*, 857 F. Supp. 2d 267, 280 (E.D.N.Y.

2012)).

Under Rule 702 of the Federal Rules of Evidence, the Court is charged with a

"gatekeeping" obligation with respect to expert testimony: the trial judge must ensure "that an

expert's testimony both rests on a reliable foundation and is relevant to the task at hand."

*Daubert*, 509 U.S. at 597. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if: (a) the expert's
> scientific, technical, or other specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue; (b) the testimony is based

on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "Under *Daubert*, factors relevant to determining reliability include the theory's testability, the extent to which it has been subjected to peer review and publication, the extent to which a technique is subject to standards controlling the technique's operation, the known or potential rate of error, and the degree of acceptance with the relevant scientific community." *Restivo v. Hessemann*, 846 F.3d 547, 575–76 (2d Cir. 2017) (internal quotations and citation omitted). The reliability inquiry is "a flexible one," *Daubert*, 509 U.S. at 594, and the factors to be considered "depend[ ] upon the particular circumstances of the particular case at issue." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). When applying the gatekeeping obligation to non-scientific testimony, a district court may choose to utilize some or all of the above *Daubert* factors, or it may look to other indicia of reliability. *Id*. Ultimately, a district court has "the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id*. at 142.

### 1. Qualifications

The parties identify Dr. Van Gorder as an orthopedic surgeon but have provided no evidence concerning his qualifications or experience. Even assuming Dr. Van Gorder is qualified to testify as an expert with respect to knee and shoulder injuries, for the reasons that follow, the Court finds his opinions as to causation are not sufficiently reliable and must be precluded.

### 2. Reliability

#### a. Knee Injury

Defendant seeks to preclude Dr. Van Gorder from proffering an opinion that Plaintiff's knee condition, chondromalacia and synovitis (arthritis and inflammation), was caused by the

June 27, 2012 fall. (Dkt. No. 36, pp. 24–25). Dr. Van Gorder testified that during the arthroscopic surgery on Plaintiff's knee, (Dkt. No. 34-2, p. 288), he ruled out meniscal tear, and diagnosed chondromalacia of the patellar status post contusion (arthritis under the kneecap) and synovitis (inflammation of the lining of the joint). (Dkt. No. 34-2, p. 292). Dr. Van Gorder testified that both conditions can be caused by overuse, (*id.*), but that he concluded, based on the history Plaintiff provided, that damage to his knee was due to "the trauma." (*Id.* at p. 294). Dr. Van Gorder acknowledged that there was nothing he could "physically see" during the surgery that indicated Plaintiff suffered from "an acute injury as opposed to an overuse injury." (*Id.*). Although there is evidence of a temporal relationship between Plaintiff's fall and the commencement of knee pain, *see DeRienzo v. Metro. Trans. Auth.*, 694 F. Supp. 2d 229, 240 (S.D.N.Y. 2010) (explaining that "in appropriate circumstances, a temporal relationship between two events can serve as one aspect of a more thorough differential diagnosis"), in the absence of a differential diagnosis or meaningful analysis, during which Dr. Van Gorder weighed Plaintiff's medical history and ruled out other possible causes, such as overuse, there is no basis on which to find that Dr. Van Gorder's causation opinion is reliable. *Cf.*, *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) (finding the district court properly admitted treating physician's opinion that glue fumes caused throat polyps where physician "based his opinion on a range of factors, including his care and treatment of McCullock; her medical history (as she related it to him and as derived from a review of her medical and surgical reports); pathological studies . . . his training and experience; use of a scientific analysis known as differential etiology (which requires listing possible causes, then eliminating all causes but one); and reference to various scientific and medical treatises").

36

3.    **Shoulder Injury**

Defendant also seeks to preclude Plaintiff from eliciting any opinion from Dr. Van

Gorder that the June 27, 2012 fall caused his shoulder injury on the ground that such an opinion

would be unreliable. (Dkt. No. 36, p. 6). As discussed, Dr. Van Gorder has not offered an

opinion linking Plaintiff's June 27, 2012 fall to his shoulder injury; he opined only that a

"traumatic injury" caused the labral tear. Even this general causation opinion, however, fails to

meet Rule 702's reliability requirements.

During his deposition, Dr. Van Gorder explained that a shoulder labral tear "commonly is

seen with the dislocation or partial dislocation" of the shoulder and that while a fall on the

shoulder does not "commonly" cause a labral tear, "it can" in some instances. (Dkt. No. 34-2, pp.

308, 310). Dr. Van Gorder did not address whether labral tears caused by dislocation are

distinguishable from labral tears caused by a fall or explain why and how a fall might cause a

labral tear. Under these circumstances, where there is an "analytical gap between data and

opinion," the Court must "act as gatekeeper and avoid the improper introduction of unreliable

testimony based solely on an expert's invocation of . . . 'professional opinion.'" *Li v. Aponte*, 05

Civ. 6237, 2009 WL 1285928, at *7, 2009 U.S. Dist. LEXIS 59741, at *26 (S.D.N.Y. May 5,

2009). Indeed, there is nothing in the record showing that Dr. Van Gorder "considered the

available data regarding plaintiff's medical condition and history," including any previous

shoulder injury, "extrapolated, and then reached a reasoned conclusion." *Li*, 2009 WL 1285928,

at *7, 2009 U.S. Dist. LEXIS 59741, at *23. *See also Pierce*, 2017 WL 2623857, at 3, 2017 U.S.

Dist. LEXIS 93087, at *9 (precluding the plaintiff's treating physician from testifying as to

causation where there was a 13-month gap between the incident and the plaintiff's first

appointment and where the plaintiff was "an individual whose medical history reflects several

37

injuries to the same body parts as allegedly injured" in the incident). Further, given Plaintiff's

previous injuries to his left shoulder and the three-month gap between the fall and his first

complaint of shoulder pain, "only an expert, employing analysis that would pass muster under

*Daubert*, for example a differential diagnosis, would be qualified to offer an opinion as to

causation and distinguish between the effects of those unrelated injuries versus the effects" of the

June 27, 2012 fall. *Pierce*, 2017 WL 2623857, at *2, 2017 U.S. Dist. LEXIS 93087, at *5

(internal quotation marks omitted). Thus, Defendant's motion to preclude Plaintiffs from

eliciting causation testimony from Dr. Van Gorder at trial is granted.

## IV.    CONCLUSION

Accordingly, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 34) dismissing

Plaintiffs' Labor Law § 200 claim and negligence claim is **GRANTED**; and it is further

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 34) is otherwise

**DENIED**; and it is further

**ORDERED** that Plaintiffs' motion for partial summary judgment (Dkt. No. 37) is

**DENIED**; and it is further

**ORDERED** that Defendant's motion to preclude (Dkt. No. 35) Dr. Thomas Van Gorder

from offering causation opinions with respect to Plaintiff's knee and shoulder injury is

**GRANTED**.

**IT IS SO ORDERED.**

Dated: July 13, 2017

Brenda K. Sannes
U.S. District Judge